Timothy BROWN, Petitioner,

v.

Harry K. SINGLETARY, Respondent,

No. 95–7207–CIV.

United States District Court, S.D. Florida, Fort Lauderdale Division.

Sept. 9, 2002.

Timothy Brown, Avon Park Correctional Institution, Avon Park, FL, pro se.

Brenda Greenberg Bryn, Timothy Day, Federal Public Defender's Office, Fort Lauderdale, FL, for plaintiff.

Patricia Ann Ash, Celia Ann Terenzio, Joseph A. Tringali, Leslie T. Campbell, Office of the Attorney General, West Palm Beach, FL, Timothy L. Donnelly, Broward State Attorney's Office, Fort Lauderdale, FL, Ralph Jackson Ray, Jr., Broward State Attorney's Office, Fort Lauderdale, FL, for defendant.

### ORDER

GRAHAM, District Judge.

**THIS CAUSE** came before the Court upon Petitioner's Motion for Consideration of Actual Innocence as a "Gateway" Pursuant to *Schlup v. Delo.*

**THE COURT** has reviewed the motion, the pertinent portions of the record and is otherwise fully advised in the premises.

### INTRODUCTION

For seven days, beginning on July 24, 2002 and ending on August 14, 2002, the Court conducted an evidentiary hearing with respect to whether Petitioner Timothy Brown ("Petitioner") is "actually innocent," as that term of art is described in Supreme Court jurisprudence, of the first degree murder of Deputy Patrick Behan. In view of the evidence presented over those seven days and the conclusions which can be drawn from that evidence, the Court finds that Petitioner has met his burden and established that he is "actually innocent."

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.  Deputy Patrick Behan

On November 13, 1990, in the early hours of the morning, Broward Sheriff's Office ("BSO") Deputy Patrick Behan ("Deputy Behan") arrived at the Circle K Convenience store located at Hallandale Beach Boulevard and 40th Avenue, in Hallandale, Florida, to take a report about the theft of a carton of cigarettes. Deputy Behan was not initially scheduled to be on duty that night, but ultimately was placed in the area. After talking to the Circle K clerk about the theft, Deputy Behan returned to his patrol car and began to write his report. At approximately 1:45 a.m., the clerk and Stephen Antonio, a tow truck driver and the only other person in the Circle K, heard the sound of a gunshot. A little over thirty seconds later, Antonio and the clerk exited the store and discovered that Deputy Behan had been shot.

#### 1.  Crime Scene Specifics

Deputy Behan backed his patrol car into a space in front of the Circle K. The car was facing north, the engine was running and the headlights were on. The driver's side door was found closed, with the glass window half way open. An area of the roof, immediately above the driver's seat and in front of the emergency light bar, displayed a small concentration of blood spatter.

Deputy Behan sustained a gunshot wound to the left cheek area. In addition, he sustained a wound to the middle left finger. Based on this information and the blood spatter on the roof, the crime scene reports concluded that Deputy Behan stuck his left hand partially outside of the passenger compartment in a defensive move, prior to the discharge of the weapon. As the projectile passed through the middle finger of the left hand, it created high velocity spatter, which was then found on the roof of the vehicle.

The January 8, 1991 Crime Laboratory Analysis Report details BSO's findings with respect to the possible murder weapon and projectile:

1.  Projectile (A) is either a 357 Magnum or a 38 Special copper jacketed bullet.

2. Revolvers manufactured with rifling characteristics similar to evidence projectile (A) are: INA, Llama, Ruger, Smith & Wesson, Taurus and some foreign manufactures sold under various trade names.

Dr. Raul I. Villa, a forensic pathologist, performed the autopsy on Deputy Behan. According to Dr. Villa, Deputy Behan had stipling [1] on the palm of his hand. The presence of stipling on Deputy Behan's hand led Dr. Villa to believe that the gun had been fired anywhere from twelve to thirty six inches from the hand. He also believed that the gun was fired anywhere from twelve to thirty six inches from Deputy Behan's face. Dr. Villa confirmed that Deputy Behan was shot with one projectile, which went through the fingers, causing a graze type wound, and then hit Deputy Behan's face. The projectile did not pass through Deputy Behan's head.

## 2. Preliminary Investigation

Just after the shooting, a Circle K clerk called 911. The tow truck driver moved his truck to block the entrance to the Circle K. BSO arrived minutes later and began their investigation. Deputy Behan was transported to Hollywood Memorial Hospital, via helicopter, where he was pronounced dead on arrival.

The initial lead investigators were Detective Richard Scheff ("Detective Scheff") and Detective John Auer ("Detective Auer"), both from BSO's Homicide Unit.

The first possible suspect was Kevin Duhart, the man accused of stealing the cigarettes earlier that night. Duhart was quickly located, but, after investigation, was cleared of any suspicion.

## B. Timothy Brown

### 1. BSO's investigation leads them to Timothy Brown

BSO first became aware of Petitioner through an individual named Rob McGriff ("McGriff"). Just after the murder, McGriff contacted BSO and told Detective Scheff that he saw Petitioner and Keith Maddox ("Maddox") kill Deputy Behan. While BSO attempted to locate Maddox, Detective Scheff continued his discussions with McGriff. Detective Scheff became uncomfortable with McGriff's credibility and found him to be unreliable. McGriff then took a polygraph test, which showed deception. McGriff, when confronted with this information, admitted that he made up his story because he was dying from AIDS and wanted the large reward to live out the rest of his days. McGriff stated that, although he had not seen the murder, Petitioner told him that Petitioner and Maddox had killed the deputy.

BSO contacted and interviewed Maddox. Maddox denied any involvement. After passing a polygraph test, BSO released Maddox.

BSO located Petitioner on November 15, 2002, two days after the shooting. Petitioner was fourteen years old at the time and had an IQ of 56.[2] BSO Detectives Gill

---

1. Stipling is burned and unburned powder that deposits on the skin from a weapon. It causes an area of burning on the skin.

2. An IQ is assessed by taking the Wechsler Adult Intelligence Scales test (WAIS–III), the standard instrument in the United States for assessing intellectual functioning. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100

is considered to have an average level of cognitive functioning. A. Kaufman & E. Lichtenberger, Essentials of WAISIII Assessment 60 (1999). It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition. 2 B. Sadock & V. Sadock, Comprehensive Textbook of Psychiatry 2952 (7th ed.2000). *See Atkins v. Virginia,* —— U.S.

and Illaraza picked up Petitioner in Hollywood, and brought him to the Hollywood Police Department, and began questioning him. Detective Scheff met Detective Gill, Detective Illaraza and Petitioner at the Hollywood Police Department and took over the questioning. Detective Scheff reported that Petitioner stated that he had heard on the street that Maddox was the killer, but then recanted and said that he was the killer. As he continued to talk, Detective Scheff realized that Petitioner was under the influence of some type of narcotic. In fact, Petitioner confirmed that he was high on crack. Detective Scheff felt that Petitioner was overly responsive to all of his questions and was "like clay in his hands." In addition, Brown had not been read his rights. Detective Scheff stated that, upon realizing that Brown was not coherent, had not been read his rights and could not provide any details about the crime, he released Petitioner.

## 2. The Investigation Continues

One of the central focus points of the initial investigation revolved around a woman named Jackie Bain ("Bain"). Bain contacted BSO and told them that a Steven McGill killed Deputy Behan because Bain had a series of sexual encounters with BSO deputies around the Circle K area. Bain's story, however, changed repeatedly over the course of the investigation, causing her to be discredited. BSO eventually dropped Bain and McGill as potential suspects.

## 3. Keith King

Although Detectives Scheff and Auer were the initial lead investigators, Detective James Carr ("Detective Carr") and Detective Eli Thomasevich ("Detective Thomasevich") eventually took lead roles. At some point in the investigation, Detectives Carr and Thomasevich had reason to believe that Keith King ("King"), and not Keith Maddox, was with Petitioner on the night of the murder. King was 18 years old at the time and walked with a limp.

On June 4, 1991, Detective Carr and Detective Thomasevich arrested King on unrelated sexual battery charges and brought him to the homicide unit for questioning. After an unrecorded pre-interview, King reportedly gave the detectives a sworn, taped statement about the Deputy Behan murder. In his statement, King claimed the following:

a) King knew Petitioner from when he used to live in Hollywood;

b) On the night of the Deputy Behan murder, King was with Petitioner at Petitioner's house on Mayo Street.

c) King was high on one or more narcotics at the time. Petitioner was not on drugs at the time and seemed to know what he was doing.

d) Petitioner said he wanted to hurt a police officer and showed King a .38 revolver with a brown handle.

e) They left Petitioner's house on Petitioner's bicycle, with King riding on the handlebars. After about an hour, they arrived at the Circle K, where they saw a police car backed into a space in front of the store. Deputy Behan was in his car, with the light on, doing paperwork.

f) They approached from one of the back streets behind the Circle K and parked the bicycle on the side of the building.

g) King remained with the bicycle, while Petitioner walked up to the patrol car. When Petitioner got to the car, he pulled the gun out from under his shirt and shot the gun one time.

h) King and Petitioner then split up, with Petitioner getting on the bicycle

and heading east on S.W. 30th street and King running south on Southwest 40th street.

i) King then met Petitioner back at Petitioner's house on Mayo Street, briefly spoke with Petitioner, and then returned home.

j) After leaving Petitioner's house on Mayo Street, King walked 12–14 miles to his home in Ft. Lauderdale.

### 4. Petitioner's "Confession"

On July 16, 1991, Petitioner was arrested for the murder of Deputy Behan. Petitioner was brought to an interrogation room and placed at a table. At the time of the interrogation, Petitioner was 15 years old. Detectives Carr and Thomasevich conducted the interrogation. Curiously, the detectives began their interrogation without the benefit of a tape recorder, however, after approximately an hour, the detectives took Petitioner's sworn taped statement.

In his statement, Petitioner claimed the following:

a) Petitioner was with King on the night of the Deputy Behan murder.

b) Petitioner had known King for five years.

c) On the night of the murder, Petitioner met up with King on Wiley Street.

d) They were both snorting powder and smoking lace.

e) They then got on a bicycle, with Petitioner pedaling and King riding on the handlebars. King had a black .38 revolver with a brown handle. As they were riding, King said he was going to kill somebody and Petitioner called King's "bluff."

f) They arrived at the Circle K on the bicycle. King jumped off the bicycle and walked over to the car. Deputy Behan tried to grab his stick, and King fired the gun, shooting Deputy Behan in the head.

g) They then both jumped back on the bicycle and went across Hallandale Beach Boulevard, heading towards Carver Ranches. King then fired the gun again and threw it in or near a rock pit.

h) Petitioner and King returned to Wiley street, where they split up.

### 5. Trial

On August 1, 1991, the State indicted both Petitioner and King for the first degree murder of Deputy Behan. King pled guilty to manslaughter charges and was sentenced to fifteen (15) years.

Prior to trial, Petitioner filed a motion to suppress his November 15, 1990 and July 16, 1991 statements to BSO. The trial court conducted a suppression hearing. The November 15, 1990 statement was suppressed, but the trial court permitted the July 16, 1991 statement to stand.

Petitioner's case went to trial. The State's case was based solely on Petitioner's confession. The State presented no eyewitnesses to the crime and it had no physical evidence. The State's witnesses testified primarily about the crime scene. Petitioner's defense focused on Jackie Bain and the sex scandal at the Circle K. The jury convicted Petitioner of first degree murder, and he was sentenced to life in prison without the possibility of parole. His conviction and sentence were affirmed, without opinion, on direct appeal. *See Brown v. State*, 657 So.2d 903 (Fla. 4th DCA 1995).

### 6. King Recants

Shortly after Petitioner was convicted, King changed his statement. King explained that he only confessed because Detective Carr had threatened him with the electric chair and had hit him in the eye. King also stated that prior to his statement being recorded, Detectives Carr and Thomasevich showed him photos of the

Circle K, described how the patrol car had been backed in, and told him there had been a bicycle in the area. In addition, Detective Carr showed King his .38 revolver as an example of the type of firearm used in the murder.

### 7. Post–Conviction Proceedings

On December 27, 1995, Petitioner filed his *pro se* Petition for Habeas Corpus in this Court. Petitioner's sole claim for relief was insufficiency of the evidence. On March 14, 1997, the Federal Public Defender was appointed to represent Petitioner. After a long and protracted discovery period,[3] on March 25, 1999, Petitioner filed his Amended Petition.

Petitioner's Amended Petition raised the following claims:

- Claim A—Insufficiency of the Evidence
- Claim B—Denial of due process because his confession was coerced and involuntary
- Claim C—Denial of due process because Brown's waiver of Miranda was not knowing and intentional
- Claim D—Erroneous Jury Instruction
- Claims E–K—Ineffective assistance of counsel on various grounds.

On October 14, 1999, Magistrate Judge Sorrentino issued a Report and Recommendation, recommending the dismissal without prejudice of Claims B and D through K for failure to exhaust them at the state court level. Petitioner objected, arguing that it would be futile for him to exhaust his claims at the state court level, because they are now procedurally defaulted and/or because he is actually innocent.

On September 25, 2000, the Court adopted Magistrate Sorrentino's Report and Recommendation, instructing Petitioner to either abandon his unexhausted claims and proceed with Claims A and C, or go back to state court to attempt to exhaust his claims. The Court specifically did not address actual innocence.

On October 10, 2000, Brown filed his Second Amended Petition. Brown, however, included Claims A, B, and C. The state moved to strike the petition, arguing that Claim B was unexhausted. The Court granted the motion to strike and ordered Brown to either file an amended petition with only exhausted Claims A and C or risk dismissal of all of his claims.

### 8. New Evidence Surfaces

On February 14, 2002, Petitioner filed a supplement to his motion to reinstate his second amended petition. In his supplement, Petitioner notified the Court that BSO had reopened its investigation into the Behan murder. Specifically, an individual named Andrew Johnson ("Johnson") had implicated himself in the murder in statements to undercover officers and a confidential informant. Based on this information, Petitioner initially asked the Court to stay his federal petition and permit him to return to state court to pursue a motion for new trial.

On February 29, 2002, Petitioner filed his Withdrawal of Request for Stay of Proceedings and Motion for Discovery of New Evidence of Innocence from BSO. Petitioner no longer wanted to return to state court, but rather, asked the Court to consider his evidence of actual innocence, not as a free standing claim, but as a gateway to hear his procedurally defaulted claims. In order to pursue this course, Petitioner argued that it needed Respon-

---

**3.** The discovery period was protracted, at least in part, due to Respondent's refusal to turn over documents relating to Petitioner's arrest and trial. Respondent attempted to appeal some of the Magistrate Judge's rulings with respect to discovery, however, the issues were ultimately resolved and the appeal deemed moot.

dent's information with respect to the Johnson investigation.

Respondent initially refused to turn over any discovery relating to the Johnson investigation, arguing that it was confidential. However, after hearings on the issue, the parties were able to reach an agreement and Respondent released the discovery materials to Petitioner.

## C. Court Conducts *Schlup* Hearing

Although Respondent conceded that all of Petitioner's unexhausted claims were procedurally defaulted, Respondent argued that Petitioner was nevertheless required to pursue his claims of actual innocence in state court. In particular, Respondent argued that Petitioner's allegations with respect to actual innocence constituted a substantive claim for actual innocence which had not been exhausted at the state court level. Furthermore, Respondent argued that Petitioner failed to plead a link between the newly discovered evidence of actual innocence and his procedurally defaulted claims and that without a link, the gateway could not be opened.

After hearing argument of counsel, the Court determined that it could proceed, under *Schlup v. Delo*, and hear evidence of Petitioner's actual innocence to determine if the gateway could be opened to hearing Petitioner's procedurally barred claims.

The evidentiary hearing lasted seven days. Both Petitioner and Respondent presented cases.

## D. Petitioner Makes His Case For Actual Innocence

Petitioner's case for actual innocence focused both on 1) evidence implicating Johnson in the crime and 2) the falsity of Petitioner's confession.

## 1. Johnson

### a. BSO Reopens Investigation Into Deputy Behan Murder

On April 23, 2001, a confidential source for the Miami–Dade Police Department known as "China" contacted Miami–Dade Police Department Detective Tom O'Keefe ("Detective O'Keefe") in reference to a possible crime. Detective O'Keefe believed China to be a reliable source, known for his honesty and integrity, and had provided information to the Miami–Dade Police Department for the past eight (8) years. A woman named Gwenda Johnson ("Gwen") had recently told China that her husband killed a deputy Sheriff at a convenience store several years earlier. China relayed this information to Detective O'Keefe. Because Detective O'Keefe believed Gwen's story might involve Deputy Behan, he contacted BSO Sergeant Dennis Gavalier.

On April 24, 2001, BSO began looking into China's allegations. It was at this time that BSO first learned that Gwen's husband, Johnson, might be a former, disgruntled BSO detention deputy. Later that day, China met with Detective O'Keefe, Sergeant Gavalier, Miami–Dade Detective Sergeant Tom Williams and BSO Major Tony Fantigrassi ("MAJOR Fantigrassi"). China informed the officers that he had met Gwen and Johnson at church. China and Gwen established a relationship and Gwen had since been confiding in China about her poor relationship with her husband. In addition, Gwen told China that several years earlier, Johnson told her that he had killed a policeman at a convenience store. Gwen claimed to be with her husband just after the crime, when he dismantled the firearm into three (3) pieces and discarded it in three (3) locations.

## b. Gwenda Johnson

### First Meeting

To obtain more information, BSO sent China to meet with Gwen, wearing a recording device. The first of these recorded transactions took place on April 25, 2001. In this transaction, Gwen recounted how her husband had killed a police officer while the officer was sitting in his car at a 7–11 convenience store. Gwen stated that, after he had been fired from BSO, Johnson watched the officer responsible for his termination, knew his schedule and knew he'd be at the convenience store on the night of the murder. Gwen claimed that someone else was in prison for the crime Johnson committed. Gwen also detailed Johnson's attire on the night of the murder—a black scully, "army fatigues, and he got some black to put on, all black (inaudible) and he paint his face black, everything."

### Johnson's File

After hearing Gwen's first recorded transaction, BSO began to verify the information it had obtained about Johnson. Johnson is a black male, born on February 7, 1970. He had indeed worked for BSO as a detention officer, but had been terminated after an Internal Affairs Investigation. In particular, Johnson had shown up on a crime scene where BSO Deputy Brian Montgomery ("Deputy Montgomery") was on duty. Because detention officers were not permitted to do this, Deputy Montgomery reported Johnson to internal affairs and he was fired. BSO fired Johnson approximately four months before the Deputy Behan murder.

BSO later discovered that Johnson had a deep seeded hatred against Officer Montgomery, not only because of his termination, but because of an incident which occurred before Johnson became a corrections deputy. When Johnson was studying to be a deputy, he reported a burglary to his home in Carvers Ranches. Officer Montgomery arrived on the scene. While in the process of making his report, Officer Montgomery noticed Johnson's books and told him that he would never make it. These comments, combined with Officer Montgomery's involvement in Johnson's termination, caused Johnson to carry a grudge against Montgomery.

### Overview of China's Further Contact With Gwen

BSO arranged to have China meet with Gwen on several additional occasions. A review of these encounters tells the following story: Several years ago, Johnson came home and woke Gwen up in the middle of the night and asked her to take a ride with him. Johnson wore army fatigues, primarily black in color, wore a black skully and had on black face paint. Johnson told Gwen that he had crept and/or snuck up on a police officer at a convenience store and shot him in the head. Johnson, after following the deputy who had gotten him fired, and knowing that deputy's schedule and days off, had intended to go to the Circle K that night to kill the man who had him fired. He told Gwen, however, that he "got the wrong guy." Johnson then broke the gun in three pieces, and he and Gwen went together to dispose of it. Gwen remembered dropping one piece near the New Way Church at 168th Street and NW 22nd Avenue in Miami.[4]

## c. Johnson's Encounters

On August 2, 2001, BSO had China set up a meeting with Johnson. China contacted Johnson and told him that he knew some "high rollers" that needed a videographer. Johnson was interested, and met with China, and two undercover officers, Detective Cedeno, known as "Chico", and

---

4. BSO searched the area Gwen described, but no firearm was found.

ATF Agent Curry, known as "T", at a strip club in Fort Lauderdale. After the meeting, Johnson left with China. BSO then arranged a false traffic stop. While they were stopped, Johnson began to tell China about his dislike of the police. He stated that he knew that the partner of the deputy that just pulled them over "got smoked," and that he knew "who smoked him," that he "got smoked sittin in his car" with ".357." In this taped transaction, Johnson indicates that BSO never got the guy who killed the cop.

Over the next week or so, Johnson met with "Chico" and "T" to discuss video work, but there were no discussions about the Behan murder. Finally, on August 16, 2001, Johnson met with Chico, T and China for dinner. Although he did not discuss the Behan murder, he did state that he used to have a Smith and Wesson Model 66 firearm, but that he had to dispose of it.

On August 23, 2001, Johnson had occasion to be alone with "Chico ." Chico asked about his criminal past. Johnson told Chico that he "put the hammer on a po-po." He then told Chico the story of how Officer Montgomery told him he would never make it and then later got him fired. Johnson describes this as his motive for killing the Deputy. He then recounted, in detail, how he walked up to the Deputy while the Deputy was sitting in his car, and "did him" at "point blank range." Johnson states that the Deputy "put up his hands like I asked him to and I offed him." Johnson identified the murder weapon as his Smith and Wesson model 66.

On August 31, 2001, Johnson met with Chico and T and retold his account of the murder. Johnson began by reiterating his past with Officer Montgomery and restating what he had told Chico the week before. This time, however, he added detail.

Johnson stated that the shooting took place at the Circle K located at 40th Avenue and Hallandale Beach Boulevard. He also indicated that he threw the gun in different places, one of which was off the Turnpike and NW 41st Street in Miami.

After these initial conversations with Johnson, BSO decided that China should meet with Gwen again and challenge her story. On September 27, 2001 China and Gwen met. He pressed her about whether Johnson really killed a deputy. Gwen did not change her account and claimed that she felt strongly about Johnson's involvement in the murder.

On October 4, 2001, Johnson met with Chico, T and their boss "Rolie,"[5] at the Fort Lauderdale Airport. At the meeting, Johnson was once again asked about his involvement in the Behan murder. Johnson drew a diagram of the Circle K, demonstrating where the deputy was parked and how he approached the vehicle. Johnson told the men that the deputy was sitting in his vehicle when he approached.

Rolie then showed Johnson a newspaper clipping showing Deputy Behan as the slain deputy on November 13, 1990. The clipping also indicated that two individuals had been arrested for the crime. At this point, Johnson conceded that he shot the wrong man, but, pointing at Behan's picture, Johnson assured the group that Behan was the deputy he killed.

The group later drove around the Circle K, with Johnson describing where the murder took place and how he approached the scene. They then drove around, with Johnson pointing out where he had disposed of the gun: 1) the cylinder in a body of water near NW 27th Avenue and 175th Street; 2) the grips in a nearby dumpster and 3) the frame off of NW 41st Street and the Turnpike in Miami.[6]

---

**5.** Undercover ATF Agent Steve McKeen played the part of "Rolie."

**6.** BSO searched these areas, but no weapon was ever found.

At one point in the midst of BSO's undercover operation, Johnson moved out of the apartment where he and Gwen resided. Major Fantigrassi and Detective Bole brought Gwen in to see them, and she voluntarily gave them her statement. In her statement, Gwen reiterated that she knew of Johnson's hatred for Officer Montgomery. She stated that Johnson talked in his sleep about, what she perceived to be, the night of the Behan murder, and how he killed the "wrong guy." Gwen also recounted Johnson's attire on the night of the murder and that she was with him when he disposed of the gun.

At BSO's direction, Gwen attempted to get Johnson to move back into their home. After several unsuccessful attempts, however, BSO took another approach—a recruitment drive. BSO contacted Johnson about possible future employment, and, taking the bait, he applied.

On February 5, 2002, Johnson met with Detective Michael Bole ("Detective Bole"), to discuss his application. At the meeting, Johnson told Detective Bole about his dislike of Officer Montgomery and the previous incident that resulted in his termination from BSO.

On February 8, 2002, BSO brought Johnson in for a "pre-employment" polygraph. The polygraph was designed to get Johnson to talk. Richard Hoffman ("Hoffman"), a BSO polygrapher, performed the polygraph. During his interview and polygraph, Johnson told Hoffman that he told drug dealers that he killed Deputy Montgomery, but that he hadn't actually killed anyone. In response to several of the questions, Johnson showed deception. In particular, the questions within which Johnson showed deception are as follows:

- Did you ever consciously kill anyone while in the military? Answer—No
- Did you ever consciously kill anyone in authority? Answer—No
- Did you ever intentionally shoot anyone? Answer—No
- Besides traffic, did you ever commit a crime the police don't know about? Answer—No
- Between your time at BSO and the military, did you ever kill anyone in authority? Answer—No
- Between your time at BSO and the military, did you ever shoot anyone in authority? Answer—No
- Between your time at BSO and the military, did you ever commit a crime the police don't know about? Answer—No
- Other than telling someone you shot a deputy, did you ever really shoot a deputy? Answer—No
- Other than telling someone you killed a deputy, did you ever really kill a deputy? Answer—No

Although Johnson's polygraph chart indicated deception to all of these questions, Hoffman opined that the deception could be related to lies that Johnson previously told and not necessarily because he had killed Deputy Behan.

After the polygraph, Detective Bole and Major Fantigrassi confronted Johnson with his polygraph results and the taped interactions with the undercover officers. In response, Johnson claimed that he had fabricated everything to impress the drug dealers and that it was all "fools talk." Johnson denied killing Deputy Behan. In addition, Johnson claimed to know details about the murder from his work as a television cameraman.

Shortly after Johnson's polygraph, there was a media leak in the case and BSO felt its investigation had been compromised. On March 13, 2001, a headline in the Miami Herald read "Guard's wife says he shot deputy." Later on that same day, Gwen recanted her story.

Hours after the Miami Herald article ran, Gwen met with Detective Bole and Major Fantigrassi. She claimed that she had made up her entire account because she was upset with Johnson for cheating on her and being a bad husband. She stated that he never told her that he killed anyone. When Detective Bole confronted her, asking her how it was possible that her and Johnson's stories were so similar, she told the detectives that she was writing a murder mystery book and that Johnson must have read it. Gwen claimed that she saved the book on her computer hard drive, but no longer had a copy. BSO never obtained a warrant to search the hard drive of Gwen's computer. It is unclear from the record whether BSO actually applied to a judicial officer for the warrant.

### d. Edward Davis

In addition to presenting the taped statements of both Johnson and Gwen, Petitioner presented the testimony of Edward Davis ("Davis") to further implicate Johnson in the murder.

According to Davis, just before 2:00 a.m. on the morning of November 13, 1990, he left his mother's home at 4110 Southwest 28th Street and was on his way to work. As was his usual routine, Davis planned to stop at the Circle K for cigarettes and coffee. As he rounded the corner of 28th street, and started to proceed south on NW 40th Avenue towards the Circle K, he noticed that a police car was there, parked next to the ice machine and backed into a spot. He also saw two people in the store, the clerk, who he had met before, and someone else. As soon as he saw the clerk, he heard a bang and saw a flash. Davis immediately ran forward approximately 12 feet to a large tree. Although it is unclear exactly how long he remained at the tree, anywhere from five to sixty seconds, Davis remembers staying at the tree, terrified, looking at the store. In the direction of the police car, Davis saw a black individual running behind the Circle K, in a gap between the building and the wall. Davis remembers the person wearing dark clothing, and having either very neat hair or wearing a do-rag or a hat on his head.

Just after the shooting, Davis saw the Circle K clerk and the other individual in the store, Antonio, come to the door. He then left the tree and ran back down 40th Avenue to 28th Street, ran west and ultimately into an alleyway. After smoking several cigarettes, he realized that he dropped his cassette player. When he went back to the tree, a BSO deputy saw him and told him that another deputy had been shot. Davis told the deputy that he did not know anything.

Almost three years later, while in the Broward County Jail, Davis saw news reports on television about two boys on trial for the murder of Deputy Behan. He talked to his roommate about what he saw. He then told his public defender what he had seen. His public defender said he would relay the message. Although Petitioner's trial counsel was made aware of Davis' statement just after the verdict was reached, he did not raise it in Petitioner's post conviction motions.

### 2. Falsity of Petitioner's confession

### a. Inconsistencies With Facts of Crime

Petitioner also presented testimony and evidence to establish that he could not have been the murderer, and therefore that his confession was false. In particular, Petitioner presented the testimony of both Davis and Philip Howard to establish that no one saw two black males on a bicycle just before or after the crime.

#### Edward Davis

As detailed above, Petitioner presented the testimony of Davis to show that John-

son's description of the crime was consistent with eye witness renditions of the evening. In addition, Petitioner presented Davis to establish that he and King were not spotted, by anyone, that evening riding to or from the Circle K. Davis testified that he would have been able to see a bicycle come north across Hallandale Beach Boulevard on NW 40th avenue that night, but he did not. Nor did Davis hear a second gunshot.

### Philip Howard

On November 13, 1990, at approximately 1:30 a.m., Philip Howard ("Howard") left his friend's house on 33rd Court and started to walk north on NW 40th Avenue towards his home. When he was about five houses south of the Circle K, he heard a single gunshot ring out from the direction of the Circle K. Howard stopped for a second and looked around. He then continued walking north toward the Circle K. About 15 seconds later, Howard saw a cab turn south on NW 40th Avenue, coming west from SW 30th Street. He looked at the cab for about two seconds, it passed him, and he kept going. He passed the Circle K, but then noticed several police cars arriving. He stopped to talk to the police, heard about the shooting and gave his sworn statement about what he had seen. At the evidentiary hearing, Howard testified that he could see well beyond Hallandale Beach Boulevard and that he was "one hundred percent" sure that he did not see two black males on a bicycle in the area of the Circle K or crossing over NW 40th Street and go north through the intersection across Hallandale.

### b. Inconsistencies With King's Confession

In addition, Petitioner presented testimony to establish that King's statement was false. Petitioner presented Mary Pendegrass, King's foster mother. Pendegrass testified that she had never seen

King with Petitioner, thus disputing that King and Brown had known each other. In addition, Petitioner presented Monica Willis ("Willis"). Willis testified that she and her family were living in Petitioner's old house on Mayo Street on the night of the Deputy Behan murder. She stated that neither Petitioner, nor his parents, were there that night and that no one came to the door to ask for Petitioner.

### E. Respondent's Case After Change In Strategy

Respondent initially asserted that it would not be presenting any evidence with respect to the culpability of Johnson and/or the veracity of his statements. However, Respondent later changed its course and decided that it would present some witnesses and evidence to rebut Petitioner's case in chief.

### 1. Major Fantigrassi

Much of Major Fantigrassi's testimony was spent opining on how and why Johnson's admissions were false. In particular, Major Fantigrassi opined that Johnson and Gwen learned all of their information about the crime from two newspaper articles, one printed on March 4, 2001 and one printed on April 29, 2001, about the Behan murder. The articles detailed some of the specifics about the crime, including, where it occurred, where the car was parked, shot fired at point blank range and the time of the murder. The articles also mentioned an unclaimed reward of $130,000. At one point, Major Fantigrassi opined that he thought that China fed information to Gwen and/or Johnson in an attempt to claim reward money. Major Fantigrassi also attempted to discredit the polygraph, explaining that because it was set up as a ruse, it was not valid. He said BSO never intended for it to be used as a true polygraph, and only wanted to use it

as a tool to interrogate Johnson. The remainder of Major Fantigrassi's testimony focused on the investigation and his opinions of the facts of the case.

## 2. Polygrapher Hoffman

Respondent called BSO Polygrapher Hoffman to the stand to explain the polygraph. Hoffman, in accordance with Major Fantigrassi's testimony, stated that the polygraph was not reliable, as it had been conducted as part of a ruse.

## 3. Detective Eli Thomasevich

Respondent called now retired Detective Thomasevich to the stand to discuss his previous investigation of Petitioner and King. Detective Thomasevich added little, if any, new information and could not remember many of the details about the investigation.

## 4. Patrick Hennig

Respondent called Patrick Hennig ("Hennig") to bolster King's confession. Hennig testified that at approximately 1:20 a.m., on November 13, 1990, he as driving north on 40th Avenue to go to work. As he approached 30th Street, Hennig heard a gunshot and a thin young black male, approximately six feet tall and 150 pounds, ran in front of his car. Hennig came to a complete stop, and the young man stopped briefly in front of his car. Hennig testified that the man looked between 27 and 34 years of age. Hennig noticed that the man was running, but did not mention a limp.

The state did not call Hennig as a witness at Petitioner's trial. Hennig's credibility was damaged by his defensive posture on the stand and his extensive criminal record.

## 5. Eddie Lopez

Sometime late in the evening on November 12, 1990 or the early morning of November 13, 1990, Eddie Lopez ("Lopez") went outside of his front door to look for his cat. Lopez lived across the street from the back side of the Circle K. When he went outside, Lopez saw a black male running from around the corner and across his street. Lopez testified that the man was wearing pants and had short hair, but that he did not notice whether the man was wearing a shirt or shoes. After the man ran by, Lopez walked over to the Circle K parking lot, noticed that a BSO patrol car was backed in, and then returned home to bed. Lopez did not hear a gunshot and is not sure of the exact time he was outside.

The next morning, Lopez went outside and discovered that a deputy had been killed. Lopez did not, however, contact any law enforcement officers at that time because of an outstanding warrant out for his arrest. Lopez eventually went across the street to talk with the police, but he used his brother's name, Chad Lopez, to avoid arrest. Lopez made a statement to BSO indicating that he had seen someone running by his house late the night before. At this time, he helped police do a composite sketch of the person he saw running. He also testified at the evidentiary hearing that he reviewed several photograph books, but was unable to identify the person he saw that morning.

Lopez later turned himself in on his forgery charges, and made further statements to the police about the murder. While incarcerated, Lopez identified King in a photographic lineup. This identification was made several months after the initial crime. Although Respondent was unable to produce the composite sketch Lopez helped make on the morning after the murder, Lopez and the Respondent concede that it looked nothing like the photo of King in the photographic lineup.

## F. "New" Evidence Produced After the Hearing

After the presentation of testimony and evidence was complete, and the parties submitted their written closing arguments, the Court received Petitioner's Emergency Notice of Newly–Provided *Brady* Material on the Issue of "Actual Innocence." In his pleading, Petitioner notified the Court that on August 27, 2002, after the parties filed their closing arguments, Assistant State Attorney Tim Donnelly sent Petitioner's counsel a letter, advising them that FDLE had provided him with a November 13, 1990 photo lineup form executed by "Chad Lopez." At that time, however, neither BSO nor FDLE had the actual photo lineup to accompany the form.

Apparently, FDLE, in its investigation, uncovered the photo lineup form Lopez executed the day of the Behan murder. Oddly, this form had not been turned over to Petitioner, either at trial or at any time during these proceedings. In the course of its investigation, FDLE interviewed and took taped statements of Lopez, Thomasevich, Carr, and Detectives Scheff and Auer. Respondent agrees that the Court is able to consider this evidence in conjunction with the present proceedings.

The November 13, 1990 photo lineup affidavit was signed by "Chad Lopez"[7] and notarized by Detective Carr. It states that Lopez was shown a photographic lineup by Detectives Carr and Thomasevich and that Lopez "by his signature ... affirms and says that the individual appearing in the picture in position number 5 is the same individual who committed the crime more specifically detailed in case number PK 90–11–314."

In Lopez's interview, he reviewed the affidavit and confirmed that it was his handwriting, but stated that he did not remember looking at a photo lineup on November 13, 1990. In Detective Carr's interview, he stated that they might have shown Lopez a photographic lineup, but he didn't think Lopez picked anyone out. This statement is inconsistent with the affidavit. Detective Carr then stated that Petitioner might have been in the November 13, 1990 lineup Lopez identified.[8] In Detective Thomasevich's interview, he stated that he did not remember showing Lopez a photographic lineup the night after the murder. In Detective Scheff's interview, he indicated that the only person BSO had on November 13, 1990 as a potential suspect was Kevin Duhart, the man accused of stealing the carton of cigarettes. Detective Scheff was unaware of the photo lineup affidavit and expressed concern that it had not been turned over. Detective Scheff stated "this would be *Brady* material. I mean, I think its *Brady* material. I think its *Brady* material because it tends to undermine the credibility of Eddie Lopez." Finally, in Auer's interview, he indicated that he knew nothing about the affidavit and that it was "news" to him.

## LEGAL ANALYSIS

### A. General Requirements for Writs of Habeas Corpus

A federal district court's power to grant relief to a petitioner convicted in the state system is limited. A federal district court may not grant an application for a writ of habeas corpus unless:

(A) the applicant has exhausted the remedies available in the courts of the State; or

---

**7.** At the evidentiary hearing, Lopez testified that he used his brother's name when he first spoke with police, due to an outstanding warrant for his arrest.

**8.** This could not be true, as Tim Brown was not identified as a suspect until November 15, 1990.

(B) (i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

### Exhaustion Requirement

██ As a matter of comity, state courts must be afforded a fair opportunity to first hear claims raised in a federal habeas corpus application which challenge an applicant's custody pursuant to a State court judgment. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). To exhaust available state court remedies, a petitioner must fairly present all the claims that he will make in his habeas corpus petition in front of the highest available state court, including courts sitting in discretionary appeal, otherwise a procedural default occurs. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48, 119 S.Ct. 1728, 1733–34, 144 L.E.2d 1 (1999).

### Procedural Bar

██ This Court's authority to collaterally review state criminal convictions pursuant to writs of habeas corpus is also severely restricted when an applicant has failed to follow applicable state procedural rules in raising procedurally defaulted claims. Federal habeas corpus review of a convicted state prisoner's claims is barred by the procedural default doctrine if the last state court to review the claim clearly and expressly states that its decision relies on an independent State procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), and

that State procedural bar provides an adequate and independent State ground for denying relief. *Harris*, 489 U.S. at 262, 109 S.Ct. 1038. This doctrine serves to ensure that State prisoners will first seek relief in accordance with available State procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578–79 (11th Cir.1988), and to "lessen the injury to a State that results through reexamination of a State conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

██ In addition, unexhausted claims may be deemed exhausted for the purpose of 28 U.S.C. § 2254(b), when it is clear that the State courts would refuse to consider the new claims because they previously had never been raised. *Teague v. Lane*, 489 U.S. 288, 297–98, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Castille*, 489 U.S. at 351–52, 109 S.Ct. 1056; *Chambers v. Thompson*, 150 F.3d 1324 (11th Cir.1998). These types of claims, claims which can no longer be raised in state court because of a state procedural rule, are deemed procedurally barred or procedurally defaulted claims. *See Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Wainwright v. Sykes*, 433 U.S. 72, 81–88, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

### Overcoming A State Procedural Bar

██ Federal courts are precluded from hearing the merits of procedurally barred claims absent a showing of (1) cause for the default and actual prejudice growing out of the alleged violation of Federal law,[9]

---

**9.** To establish cause, the applicant must show that some objective factor external to the defense impeded his or counsel's efforts to comply with the State's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639 (1986). To show prejudice, the applicant

must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir.1992). Petitioner does not raise cause and prejudice as a ground for overcom-

or (2) a resulting fundamental miscarriage of justice if the Federal court does not consider the claims. *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

## B. Fundamental Miscarriage of Justice

■ Under the fundamental miscarriage of justice exception to the procedural default rule, a procedural default will be excused if "the constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id; Schlup v. Delo,* 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). In *Schlup,* the Supreme Court held that:

> [I]f a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

*Schlup,* 513 U.S. at 316, 115 S.Ct. 851.

### 1. Actual Innocence Standard

■ To establish that he is "actually innocent," such that a procedural default will be excused, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324, 115 S.Ct. 851. The Court, in reviewing this new reliable evidence, must be persuaded that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 115 S.Ct. 851 (adopting standard set forth in *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639 (1986)).

ing his procedural default in the instant pro-

■ To meet this standard, a petitioner is not bound by traditional rules of admissibility that would govern at trial. *Id.* at 327, 115 S.Ct. 851. Rather, "the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Id.* at 327–28, 115 S.Ct. 851.

The Court notes that, despite Respondent's assertions to the contrary, the new reliable evidence of actual innocence does not necessarily need to be "linked" to a petitioner's procedurally defaulted claims. Although *Schlup* requires both a showing that there are procedurally defaulted claims and a showing of actual innocence to excuse the default, the Court does not read *Schlup* to require a showing that the evidence of innocence relates to, or is linked to, the constitutional claims. *See e.g. Carriger v. Stewart,* 132 F.3d 463 (9th Cir.1997) (actual innocence established by government witness' post-trial confession that indeed, it had been he who committed the murder for which petitioner was convicted; new trial granted based upon constitutional error deriving from government's unrelated *Brady* violation in failing to provide defense with that witness' Department of Corrections file, which would have shown that the witness was a pathological liar—evidence which could have impeached the witness' credibility at trial.) The only post *Schlup* case in which a link "requirement" has been discussed is the Eastern District of Virginia case of *Weeks v. Angelone,* 4 F.Supp.2d 497 (E.D.Va. 1998). *Weeks,* however, is distinguishable in that the petitioner was arguing that he was "actually innocent" of the death penalty, not the crime, and the district court relied on the pre-*Schlup* case of *Spencer v. Murray,* 18 F.3d 229, 236 (4th Cir.1994) in determining a link was required. Accord-

ceeding.

ingly, the Court finds that a link between the procedurally defaulted claim and the new evidence of actual innocence is not required to open the gateway.

## 2. Distinguishing Substantive Actual Innocence Claims from Procedural Actual Innocence Claims.

Before continuing, it is important to distinguish between substantive claims for actual innocence and procedural claims for actual innocence. In its pleadings and oral argument to the Court, Respondent repeatedly stressed that this Court should not and cannot hear Petitioner's new evidence of actual innocence, because that evidence, and any claims associated it, have not been heard by the state courts. Respondent, in making this argument, failed to recognize the clear distinction between substantive and procedural actual innocence claims.

A substantive actual innocence claim is relatively straight forward. These are the claims that "I didn't do it, therefore, set me free." These substantive actual innocence claims are the subject of many state motions for new trial based on newly discovered evidence. Florida Rule of Criminal Procedure 3.850(b)(1) permits a petitioner to bring a motion for new trial at any time based on newly discovered evidence if "the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence." These substantive claims for actual innocence, however, cannot be the basis for relief in a federal habeas petition, absent constitutional error. *See Herrera*

*v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). Accordingly, a habeas petitioner, challenging his state court conviction, cannot raise a free standing, substantive claim for actual innocence in the federal forum.[10]

Substantive, free standing, actual innocence claims are distinguishable, however, from procedural actual innocence claims. Procedural claims are not the "I didn't do it, set me free" claims, but rather, they are the "I didn't do it, therefore it would be a fundamental miscarriage of justice if you could not hear about the constitutional errors at my trial" claims. In *Schlup,* the Supreme Court clearly distinguished substantive and procedural actual innocence claims. "Schlup's claim of innocence is thus 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Schlup,* 513 U.S. at 315, 115 S.Ct. 851 (quoting *Herrera,* 506 U.S. at 404, 113 S.Ct. 853).

In this case, it is undisputed that Petitioner's claims are either exhausted, and thus can be heard by this Court on the merits, or are procedurally defaulted.[11] Upon a proffer by Petitioner of his newly discovered evidence of actual innocence, specifically the evidence relating to Johnson, the Court determined that it could

---

**10.** The Supreme Court in *Herrera* left open the possibility that, "in a capital case a truly persuasive demonstrative of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Herrera,* 506 U.S. at 417, 113 S.Ct. 853.

**11.** If petitioner attempted to return to state court to exhaust his unexhausted claims (except for his newly discovered claims) he would be barred from raising them by Florida's procedural rules. Accordingly, these claims are procedurally barred.

hear Petitioner's evidence of innocence to determine if the gateway could be opened for the Court to hear Petitioner's procedurally barred claims. At no time in the proceedings has Petitioner argued that he should be released solely on the evidence of actual innocence. Nor would the Court be able to do so. Rather, the Court only heard his new evidence of innocence to overcome his procedural obstacles.

## C. Application of Standard to Record

■ In applying the actual innocence standard to the aforementioned facts of this case, the Court first reviewed the facts as they stood prior to the discovery of Johnson. The Court then reviewed the evidence implicating Johnson in the murder to determine its potential effect on a jury.

### 1. Petitioner's Confession

As further detailed above, Petitioner was fourteen at the time of the Deputy Behan murder and was fifteen (15) at the time of his confession. Petitioner, at the time of his confession, had an IQ of 56. At his trial, the State presented no eyewitnesses to the crime and no physical evidence linking him to the crime. The only evidence against Petitioner was his July 16, 1991 statement and King's June 4, 1991 statement.

A review of Petitioner and King's statements reveals many inconsistencies. The first is that King claimed that Petitioner is the killer, while Petitioner claimed King was the killer. Second, King states that he met Petitioner at Petitioner's house on Mayo street, but the record reflects that Petitioner did not live on Mayo street at the time of the murder. In Petitioner's statement, Petitioner claims to have met King at Petitioner's home on Wiley street. This inconsistency tends to show that Petitioner and King did not know each other or where each other lived on the day of the murder. Third, each statement has a different version of how the murder took place. King states that after Petitioner shot Deputy Behan, they went separate ways, with Petitioner on his bicycle and King on foot. King claims to have later met Petitioner at his house on Mayo street, but, as stated earlier, Petitioner no longer lived at Mayo street. In fact, Monica Willis, an individual living at the Mayo street address at the time of the Deputy Behan murder testified that neither King nor Petitioner were at her house on the night of the murder. Petitioner's version of how the murder took place is markedly different that King's version. Petitioner claimed that after King killed Deputy Behan, the two left the scene together, on the bicycle. Petitioner also alleged that King shot the gun in the air a second time after the murder and then disposed of the gun in a rock pit. Interestingly, none of the witnesses in the area the night of the crime, Davis, Howard, Hennig or Lopez, heard a second gun shot, nor did any of the witnesses see two boys together on a bicycle. Petitioner and King's statements appear to be consistent only with respect to the details the police could ascertain prior to their arrest, such as the location of the car and a gunshot wound to the head.

Although this phase of the case is not related to Petitioner's confession, and whether it was knowing and voluntary, it is interesting to note that both Petitioner and King gave their statements to Detectives Carr and Thomasevich. Both Petitioner and King claim to have been physically assaulted before giving their statements and to have been shackled to the ground. However, without an evidentiary hearing on these issues, the Court is not in a position to determine the truth or falsity of these allegations.

Aside from King and Petitioner's inconsistent statements, Petitioner's statement, standing alone, is inconsistent with many

of the known details about the crime. Petitioner was never identified, nor was there ever any evidence linking him to the crime. Davis and Howard, both in a position to see Petitioner and King on the bicycle, stated that they did not see Petitioner. Petitioner's story, as captured in his statement, is somewhat illusory. This is particularly true because Petitioner had no clearly established motive. In fact, BSO reported that Petitioner stated in his "confession" that King committed the murder on a dare.

## 2. Andrew Johnson

A review of the evidence presented with respect to Andrew Johnson tells a chilling story. Essentially, the Court was presented with two people, who, over a ten month period of time, tell virtually identical stories about a murder that occurred eleven years earlier. Johnson and Gwen's stories are too consistent to be complete fabrications. In addition, the Court has been presented with a man who knows virtually every detail about the crime. Details he has repeated to several different people. Finally, the Court has been presented with a man who has a motive for murder. Johnson hated the man he intended to kill.

### a. Consistencies between Gwen Johnson and Andrew Johnson's Accounts

As detailed in the facts above, Gwen and her husband told virtually identical stories about the night of the Deputy Behan murder. Both state that the murder occurred in the early morning hours of November 13, 1990. Both state that Johnson was wearing black and some type of army fatigues or camouflage and had something, either a hood or a skully on his head. With respect to their stories about Deputy Behan's location, Gwen and Johnson's stories are entirely consistent. Both indicate that Deputy Behan was sitting in his car, at a convenience store, writing and/or do-

ing paperwork. Both describe how Johnson watched/"scouted" the Deputy and knew where he'd be that night. Both describe in detail how Johnson parked his car at a distance and "crept" up on foot to Deputy Behan's car. Both Gwen and Johnson detail how Johnson broke the gun apart and disposed of it in different places. In fact, the locations to which Gwen and Johnson state they dropped the gun are less than one mile apart. Finally, Gwen and Johnson are consistent in telling why Johnson committed this crime. Each talked about how Deputy Montgomery was instrumental in the termination of Johnson and how Johnson loathed him for it.

The probability that Gwen and Johnson's statements were only mere book passages or fictitious tales told to impress drug dealers is unlikely. Gwen's hypothesis, that Johnson read her "book" and therefore their stories were similar, has absolutely no evidentiary support. No book was located, nor does this Court believe it ever will be. Furthermore, this Court, as the fact finder and judge of credibility, found Gwen's recantation completely incredible. While her earlier, recorded statements, made without her knowledge, had the "ring of truth" to them, her recantation did not. Furthermore, Johnson's explanation of his incriminating admissions was not that he read his wife's book, but rather, that he was only trying to impress drug dealers.

### b. Johnson's Knowledge of Details of Crime

The fact that Gwen and Johnson told such similar stories is bolstered by the fact that their statements are completely consistent with the known details of the murder.

Johnson repeatedly stated that he killed Deputy Behan with a Smith and Wesson, Model 66 Firearm. This is entirely consis-

tent with the type of weapon used in the murder. Johnson states that the projectile was a hollow point. BSO's ballistics tests show that the projectile used was a .357 jacketed projectile. BSO's report indicates that this could have been a hollow point, but the projectile was too damaged to make a conclusive determination. Johnson states that he shot one time, once again, consistent with the known facts about the crime.

Probably the most consistent facts stated by Johnson, and therefore the most compelling, are his statements and actions regarding Deputy Behan's actions and the location of the projectile after it was discharged. Johnson states that he told Deputy Behan to place his hands up. Johnson also, in the videotape, indicates how Deputy Behan's hands were raised, with his palms facing out. This is entirely consistent with the medical examiner's testimony that the projectile passed through Deputy Behan's third and fourth fingers prior to reaching his head. Johnson also indicates that he shot Deputy Behan on the left side of his face, in the temple. Once again, this is entirely consistent with the medical examiner's testimony. Deputy Behan was shot in the left side of his face, near the cheek area.

As set forth in the fact section above, Johnson knew many more details about the crime, including that Deputy Behan was in uniform, sitting in his car, doing paperwork, and that the murder occurred between one and two in the morning. Interestingly, Johnson's description of his approach and possible escape route is corroborated by Davis's testimony that he saw a lone black gunman darting back from the police car—through the gap between the Circle K and the wall.

The Court finds that it cannot ignore the consistencies between Johnson's account and the facts of the murder. Typically, law enforcement would be very pleased to have suspects repeatedly share the minute details of a murder. Indeed, the more details known by a suspect, the more likely it is that they are the assailant. Johnson simply knows too many details to be ignored.

### c. Motive

The Court heard, in Johnson's own words, his intense disdain for Deputy Montgomery. There is no doubt that Johnson blames Deputy Montgomery for his termination from BSO. There is no doubt that Johnson stated that this disdain was why he went to the Circle K on November 13, 1990. The Court finds that it is no coincidence that Deputy Behan was killed just four months after Johnson was terminated. Indeed, this is what he told his wife and this is what he told the undercover officers. Johnson maintained, to the undercover officers, that Deputy Behan was "the guy he did."

### 3. Respondent's Case

Although Respondent initially stated that it was not going to address the credibility and/or culpability of Johnson, it eventually decided to present witnesses. In attempting to rebut Petitioner's case, Respondent presented MAJOR Fantigrassi, Lopez, Hennig, Detective Thomasevich and BSO Polygrapher Hoffman. Of the five witnesses, the Court places little credence in the testimony of Lopez or Hennig. Lopez, as evidenced by the newly discovered photolineup affidavit, has identified two different people for the same crime. He did not appear to have a clear memory of the evening or the events following the evening. Hennig's testimony was jaded by his criminal history and the fact that his story had changed over the years. Indeed, the state did not present Hennig at Petitioner's trial. Accordingly, his testimony at this juncture lacks credibility.

One aspect of the Respondent's case is quite troubling. Throughout the course of their reopened investigation, BSO pursued this case with fervor. The vigor and tenacity exhibited by BSO in pursuing the investigation is commendable. Only days after being notified by the Metro Dade Police Department about China's information and Andrew Johnson's alleged involvement, BSO took action. Ten months of investigative work, 6030 total man-hours, and the expenditure of at least $250,000 of the taxpayer's funds is a small sum to protect the integrity of the judicial system, the stature and nobleness of law enforcement, the peace of mind of Deputy Behan's family and friends and, of course, last, but not least, the possible freedom of Petitioner.

In fact, in his 99 page report, Major Fantigrassi analyzes how Gwen and Johnson repeatedly describe the details of the crime. Furthermore, in the incident reports prepared by the undercover officers, they make statements such as "a full confession was obtained in regards to the incident" and "conversation was brought up pertaining to the homicide. The target [Johnson] further confessed such action." A review of the tapes, transcripts and reports prepared by BSO, prior to the media leak, reveal a well thought out and intense criminal investigation. An investigation that appeared to be directed at arresting Johnson.

On the witness stand, however, Major Fantigrassi's testimony was dramatically in contrast and in opposition with the position he, as Chief Investigator, and BSO took when it first started its investigation and that which was set forth in his report. Rather than lend credence to the facts, conclusions and inferences in the 99 page report, Major Fantigrassi insinuated that China created the entire scenario for a reward and/or that Johnson learned all of his information from two newspaper articles. Major Fantigrassi's theories, however, are implausible. First, it is unlikely that China fed information to both Gwen and Johnson for reward money for a crime in which two people had already been convicted. Second, Johnson instigated most of the conversation about the murder with China and with others. In fact, some of Johnson's most implicating admissions were made when China was not present. Finally, Major Fantigrassi's opinions were just that, opinions, on occasion, unsupported by the evidence in the case.

## C. Petitioner Meets His Burden

The Court finds that Petitioner has met his burden in establishing "actual innocence," as that concept is defined in *Schlup*. It is more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt had they heard the evidence presented in this hearing. At Petitioner's trial, the jury did not have the benefit of hearing any evidence about Johnson, Gwen Johnson or the recently submitted photo lineup affidavit, possibly implicating someone other than Petitioner or King in the crime. It is inconceivable that a reasonable jury, upon hearing all of the details revealed to this Court would convict Petitioner. This Court has no crystal ball or special powers which allow it to see into the minds and souls of witnesses. It can merely rely upon the evidence presented by the litigants in this proceeding. Based upon that evidence, there is reasonable doubt in this Court's mind, and would be in a reasonable jury's collective mind, that Petitioner is guilty of the first degree murder of Deputy Behan. Accordingly, Petitioner has met his burden and the gateway is opened.

## D. Future Course

As detailed above, a finding of actual innocence in this case, opens the gateway for the Court to hear Petitioner's proce-

durally defaulted claims, namely, his confession claim and his ineffective assistance of counsel claims. While the Court stands firm behind its finding of "actual innocence" and its decision to open the gateway, the Court believes that the best future course for this case would be for the Court to defer hearing Petitioner's procedurally barred claims and allow Petitioner to return to state court to pursue both his substantive actual innocence claim and his potential new *Brady* claim.

### 1. Substantive Actual Innocence Claim

The Court believes that both Petitioner's interests and the interests of judicial economy might be best served by Petitioner pursuing his substantive claim for actual innocence in state court, prior to this Court hearing his procedurally defaulted claims.

Under Florida law, Petitioner will be entitled to a new trial if his newly discovered evidence is "of such a nature that it would probably produce an acquittal on retrial." *Jones v. State*, 591 So.2d 911, 915 (Fla.1991). Petitioner is not time barred under Florida Rule 3.850 from pursuing his actual innocence claim. Although this Court cannot predict how the Florida State Court would rule on Petitioner's motion, it is clear that Petitioner's claims have merit. If the State Court grants Petitioner's motion, the need for this Court to review the procedurally defaulted claims would be obviated.

Although this Court is limited in what it can consider and in what relief it can grant, it recognizes that the ultimate issue in this case is whether Petitioner has been sentenced to life in prison for a crime he did not commit. This Court can only discuss "actual innocence" from a procedural perspective. The State Court, on the other hand, can discuss actual innocence from the perspective of determining the truth.

### 2. New Brady Claim

As set forth above, and in Petitioner's Emergency Notice of Newly–Provided *Brady* Material On the Issue of "Actual Innocence," Respondent failed to provide Petitioner, both at this trial and this evidentiary hearing, with Lopez's November 13, 1990 Photo Line–Up Affidavit. The Court finds that this is potential *Brady* material, and therefore could be the subject of a new *Brady* claim pursuant to Florida Rule of Criminal Procedure 3.850.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that:

> the suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court articulated the test for determining the materiality of *Brady* evidence in *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985):

> [E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine the confidence in the outcome.

473 U.S. at 682, 105 S.Ct. 3375. The Florida Supreme Court has set forth four elements a petitioner must prove to obtain a reversal based on *Brady*:

> 1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); 2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; 3) that the prosecution suppressed the favorable evidence; and 4) that had the evidence

been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Robinson v. State,* 707 So.2d 688, 693 (Fla.1998)(quoting *Hegwood v. State,* 575 So.2d 170, 172 (Fla.1991)). Although Petitioner's *Brady* claim with respect to his trial is not properly before this Court, as it is not exhausted, the Court notes that it is likely that a Florida Court would find a reasonable probability that the jury would not have found Petitioner guilty had it known that someone other than King or Petitioner was identified running near the scene of the murder on the night of the murder. Essentially, this evidence supports a defense theory that someone else committed the crime.

If Petitioner returned to state court to exhaust this claim, and the state court found that the newly discovered photo line-up affidavit is indeed *Brady* material, Petitioner could be granted a new trial—the same relief that this Court would be able to grant if Petitioner can prevail on his constitutional claims. If, on the other hand, the state court denied Petitioner's *Brady* claim on the merits, Petitioner could still return to this Court to have his constitutional claims heard. These claims would include his procedurally barred claims and his exhausted claims, including the *Brady* claim, which after State Court review would be procedurally exhausted and properly before this Court.

### 3. End Result

There are two possible results of an immediate evidentiary hearing, in this Court, on Petitioner's constitutional claims. One result is that the Court finds a consti-tutional error and remands the case to the state court for a new trial. The other result is that the Court finds no constitutional error. Petitioner would still, however, be able to return to state Court to pursue his substantive actual innocence and new Brady claims. Essentially, regardless of which route the Court takes, Petitioner eventually ends up in state court.

Although the Court is leaning towards staying this matter pending Petitioner's return to state court to exhaust his substantive actual innocence claim and his potential *Brady* claim, the Court will entertain argument on the issue.

### CONCLUSION

The integrity of the judicial system is one of the key tenets of a civilized and democratic society. The very nature of our existence will be judged and evaluated by those who trod the soil of this country long after we have departed the earth. Our children and our children's children will judge us by the way justice is administered. We as a society have a tremendous burden, for as we have seen throughout our country's history, many people have been convicted and sentenced to life imprisonment or, worse, death. Horribly, we have determined, years later, that we failed to achieve the correct result. It is not the system that failed, but the frailty and error of human judgment. As scientific evidence has become more precise and exact, we are now more aware of our human shortcomings.[12] The determination of actual innocence in accordance with the *Schlup* standard is the manner in which the Supreme Court insures that we obtain the result most akin to justice at this stage

---

12. Major Fantigrassi testified about another BSO case in which DNA evidence ultimately exonerated a wrongly convicted man. Major Fantigrassi took the confession of Jerry Townsend, a mentally impaired individual. Mr. Townsend, in his confession, admitted to killing several individuals. After he was convicted, DNA tests established that Mr. Townsend was not the killer.

of the fact finding process, prior to the resolution of any constitutional claims.

In accordance with the foregoing, it is,

**ORDERED AND ADJUDGED** that Petitioner has met his burden in establishing "actual innocence" under *Sclup* and the procedural gateway for hearing his procedurally barred constitutional claims is opened. It is further,

**ORDERED AND ADJUDGED** that his case is hereby set for a hearing before the undersigned, United States District Judge Donald L. Graham, at the James Lawrence King Federal Justice Building, 99 N.E. Fourth Street, Eleventh Floor, Courtroom One, Miami, Florida 33132 on Thursday, September 12, 2002 at 10:00 a.m. The parties should be prepared to address whether this case should be stayed and all relevant limitations periods tolled pending Petitioner's exhaustion of his New Brady claim and his substantive actual innocence claim in state court.